

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| RICHARD EGGLESTON and<br>SHANNON EGGLESTON, husband<br>and wife, | )<br>)<br>)<br>) | No. 36580-8-III |
| Appellants, | )<br>) | |
| v. | )<br>) | UNPUBLISHED OPINION |
| ASOTIN COUNTY, a public agency; and<br>ASOTIN COUNTY PUBLIC WORKS<br>DEPARTMENT, a public agency, | )<br>)<br>)<br>) | |
| Respondents. | )<br>) | |

SIDDOWAY, J. — At the conclusion of a five-day trial, a jury found Asotin County liable to Richard and Shannon Eggleston for breach of contract, inverse condemnation, and water trespass, and awarded them total damages of $1.65 million. The Egglestons' expert had testified that they sustained total damages of $1 million, however, and $1 million is what their lawyer had asked the jury to award. Under Washington law permitting a trial court to order remittitur, the trial court granted the County's request for a new trial on damages unless the Egglestons consented to a reduction of the damages awarded to $1 million. Rather than consent to the reduction, they appeal.

The Egglestons argue the jury could reasonably have inferred total damages of $1.65 million from exhibits in evidence and from testimony about a neighboring property their expert provided in cross-examination. Following de novo review, we disagree. We affirm the order granting a new trial on damages.

FACTS AND PROCEDURAL BACKGROUND

Richard and Shannon Eggleston own an eight acre parcel of land in Asotin County that is bordered on the east by the Snake River. It is bordered on the south by 10-Mile Creek and on the west by Snake River Road.

In 2009, Asotin County planned to replace the 10-Mile Bridge on Snake River Road that is located off the southwest corner of the Eggleston property. The County engaged the services of Washington State Department of Transportation agent Melinda Raber to assist it in negotiating property acquisitions from owners along the project route. Among land the County needed to acquire for the project was .38 acres in fee and a temporary easement over another .37 acres of the Eggleston property. Ms. Raber discussed terms on which the County could acquire the property with the Egglestons and kept a diary of her communications with them and others. Plans were ultimately prepared and agreed.

Among ramifications for the Egglestons from the bridge project was its potential interference with a business driveway they used for Aardvarks, a business they had operated since 2002 on their large, sandy beachfront on the Snake River. Aardvarks

2

rented jet boats, watercraft, and offered guided trips up the Snake River. The Egglestons brought in about $35,000 a year from Aardvarks' operations. Aardvarks patrons reached the Egglestons' beach by using a driveway on the south edge of the property (the "business driveway"). Although it was possible to access the beach using the residential driveway, the Egglestons had children and wanted to keep business traffic away from the residence.

After extensive negotiations, the Egglestons agreed to sell the County the .38 acres of land and temporary construction easement. The County agreed to pay a total of $134,200: $62,732 for fee title to .38 acres and the easement, and $71,400 in foreseeable damages to the Egglestons during the project construction. In addition to making that payment, the County agreed to undertake or refrain from doing other things, principal among them being to build rockeries on all new slopes on and adjacent to the Egglestons' property, to preserve the business driveway, and to reroute the Egglestons' water line and preserve their access to it.

The Egglestons were paid the $134,200 as promised, and the County began construction in or about July 2010. About three months into the work, construction unearthed artifacts and cultural resources, which resulted in construction being temporarily shut down. By then, the superstructure of the bridge had been built and the roadway on the southwest corner of the Eggleston property had been raised with fill, leaving a five-foot drop from the roadway to the business driveway. It was not an

3

immediate problem, because it was fall, moving into winter. By February 2011, however, Mr. Eggleston began pressing the County to use fill to raise the level of the business driveway in preparation for Aardvarks' Memorial Day opening. The County refused, but offered to build a temporary gravel business driveway connected to the Egglestons' residential driveway. That was unacceptable, so the Egglestons sold their boats and closed the business.

The bridge project started up again in late 2012. Due to budgeting concerns, the County could no longer build the rockeries it had promised. The County also failed to properly install the water line in the manner promised, making it more exposed to damage.

In early April 2013, the County's contractor was finally ready to reconstruct the Egglestons' business driveway. As designed by the County, the reconstructed driveway had a more northerly access from Snake River Road and would encroach on pasture. The Egglestons wanted it closer to the bridge, south of their pasture. Workers on site were directed by the County to accommodate Mr. Eggleston's wishes for the driveway's location, even though County engineers knew that guardrails to be installed would not permit a straight, direct access to the driveway they were constructing. When the guardrails were staked out the next day and Mr. Eggleston was told that his access would be constructed to circle around them, he said he no longer wanted the driveway.

4

The County's changes to the road and the land thereafter caused storm water to drain onto the Egglestons' property. The storm water created flooding and washed gravel and other debris onto the property.

The Egglestons filed suit against the County in March 2013, and amended their complaint prior to an October 2018 trial. The complaint alleged damages for breach of contract, inverse condemnation, and water trespass.

At a five-day jury trial of the Egglestons' complaint, the only witness to testify to the damages the Egglestons had sustained was their expert, Steve Knight. Mr. Knight is a realtor who, as the Egglestons' lawyer reminded jurors in closing argument, had "sold over 100 million dollars of property." Report of Proceedings (RP) at 706.

The basis for each of the Egglestons' claims was explained to jurors in one of the trial court's jury instructions. It described the "Inverse Condemnation/Takings" claim as follows:

> Rich and Shannon Eggleston claim Asotin County wrongfully took away access to their business driveway, which reduced the value of their property. Additionally, Asotin County built the road adjacent to their land in such a way as to channel storm water down their driveway and onto their pasture land, resulting in the continuous erosion of the Eggleston's residential driveway and the damaging of their hors[e] pastures.

Clerk's Papers (CP) at 26 (Instruction 7). Mr. Knight provided the following testimony about the damages related to the loss of the business driveway:

Q. Were you able to come up with a value range if the business drive were in place and they were able to have that beach business running?

A. Yes.

Q. And what is the value range for the property with the business drive?

A. 750 to a million dollars.

Q. What is it worth without the business drive?

A. 350.

Q. 350. So it had 450 to 650 depreciation?

A. For sure.

RP at 472.

The trial court's instruction describing the basis for the Egglestons' "Breach of Contract" and "Water Trespass" claims told jurors:

Breach of Contract Claim:

Rich and Shannon Eggleston claim they entered into a contract with Asotin County. The Eggleston's claim they and the County mutually assented to an agreement in which the Eggleston's agreed to sell a portion of their land and a temporary construction easement in exchange for money, some specific landscaping work including terraced rockeries and concealing vegetation, the driveways, and a waterline to their house.

The Egglestons' did receive the money, but did not receive the terraced rockeries, the concealing vegetation, the separate business driveway, or the proper waterline installation.

. . . .

Water trespass:

In the alternative to the water intrusion portion of the inverse condemnation claim on their driveway and their horse pasture, the Eggleston's claim negligent or intentional channeling and discharging of storm water onto their property has damaged their property and the County should be held liable for those damages.

6

CP at 26 (Instruction 7).

Asked about damages arising from the County's agreement to construct the rockeries, Mr. Knight testified:

Q. How much would a rockery add to, if you had the privacy from the rockery, you had the beauty from that, how much value would it add?

A. 150 to $250,000 probably.

RP at 473-74.

Asked about the waterline and storm water runoff, Mr. Knight testified:

Q. Now, as you were there, you also had a few—well, we've talked about some problems. We have talked about a waterline that is buried up in the right-of-way, and you don't have access to the water line. Is that a problem?

A. Absolutely. If you go to sell a property that has what we call a latent defect, which is not a defect that's readily apparent to a buyer but is known by an agent or an owner, it has to be disclosed; termites, maybe you know about some termites in your house, but somebody is going to have a rough time finding them, might be back in a corner.
    Having a water line that's buried nine feet under the ground that's got rocks right on top of it is a latent defect that's not if, it's when that has a problem, and, you know, whoever owns the property owns that problem then and what do you do about it? So it needed to be disclosed if you ever sold the property.

Q. Does that reduce the fair market value?

A. Definitely. Doesn't help. Definitely reduces your property value.

Q. What about, we talked about storm water intrusion. Is that considered a latent defect as well?

A. Absolutely. On every Washington State property disclosure they ask you if there are any site drainage problems or issues, and that has

> some site drainage problems and issues, and you would have to disclose that.
>
> Q.    With those two latent defects how much would that affect or would you anticipate that would affect the fair market value of the land?
>
> A.    I'm not sure that I looked at those things as a value before, but, you know, 50 to $100,000 at least.

RP at 474-75.

In closing argument, the Egglestons' lawyer talked to the jurors about how his clients tried to get the County's attention and interest without success. He made the following request for damages:

> So I come to you. Please, be interested. Award Rich and Shannon every penny. $650,000 was taken from the value of their land, another $250,000 by the breach of contract. Another $100,000 for putting a water line—you heard it today, under the road, two feet just to get to a man hole.
>
> Be interested. Thank you.

RP at 709.

Instead of awarding the Egglestons the $1 million in damages testified to by Mr. Knight and requested by their lawyer, the jury awarded them $1.65 million. In a special verdict form, they broke it down as $800,000 for breach of contract, $600,000 for inverse condemnation, and $250,000 for water trespass.

The County moved for a new trial on the basis that the damages were unsupported by the evidence. The trial court concluded that a new trial on the issue of liability was not needed, as it was clear the County had liability. As to damages, however, the trial court agreed that there had been no testimony to a loss of $1.65 million and the jury must

have based their damage awards "at least in part on a desire to punish the County for its bad treatment of one of its own citizens." CP at 76.

Relying on RCW 4.76.030, the trial court granted the new trial request unless the Egglestons consented to a reduction of the damages to $1 million. Rather than consent to the reduction, the Egglestons appeal.

ANALYSIS

Washington courts apply a strong presumption that a jury's damages determination is valid. *Univ. of Wash. v. Gov't Emps. Ins. Co.*, 200 Wn. App. 455, 480, 404 P.3d 559 (2017). "Determination of the amount of damages is within the province of the jury, and courts are reluctant to interfere with a jury's damage award when fairly made." *Palmer v. Jensen*, 132 Wn.2d 193, 197, 937 P.2d 597 (1997). Courts may not increase or decrease a jury's damages award merely because the court would have awarded a different amount. *Green v. McAllister*, 103 Wn. App. 452, 462, 14 P.3d 795 (2000).

Nevertheless, if the trial court finds, despite this strong presumption, that the jury's damages determination is: (1) outside the range of substantial evidence, (2) obviously motivated by passion or prejudice, or (3) shocking to the court's conscience, the trial court has both inherent and statutory authority to order a new trial or "may enter an order providing for a new trial unless the party adversely affected shall consent to a

9

reduction or increase of such verdict."  RCW 4.76.030; *Hill v. GTE Directories Sales Corp*., 71 Wn. App. 132, 138, 856 P.2d 746 (1993).

Where the trial court has increased or decreased an award under the statute, our review is de novo.  *Hendrickson v. Konopaski*, 14 Wn. App. 390, 394-95, 541 P.2d 1001 (1975); *see also Herriman v. May*, 142 Wn. App. 226, 234, 174 P.3d 156 (2007).

We have engaged in de novo review of whether the jury's damages determination is outside the range of substantial evidence.  "'A challenge to the sufficiency of the evidence admits the truth of [the opposing party's] evidence and any inference drawn therefrom and requires that the evidence be viewed in a light most favorable to [the opposing party].'"  *Cantu v. Dep't of Labor & Indus*., 168 Wn. App. 14, 21-22, 277 P.3d 685 (2012) (alterations in original) (quoting *Bott v. Rockwell Int'l*, 80 Wn. App. 326, 332, 908 P.2d 909 (1996)).

Focusing on the trial court's statement in its letter ruling that "[t]here was no *testimony about a loss* of $1.65 million," CP at 76 (emphasis added), the Egglestons argue that while Mr. Knight testified to only $1 million in damages, the higher damage figure was a reasonable inference from the County's negotiated payment in 2009 and from testimony about the sale of a neighboring property elicited by the defense from Mr. Knight.

*The County's 2009 payment*

The Egglestons first argue that the jury heard and saw evidence that the County agreed to pay $134,132 to the Egglestons in 2009 for .38 acres in land, from which the jury could conclude that a full acre was worth $348,242, and eight acres of the property could be worth as much as $2,785,937.

This argument fails for many reasons. First, the total value of the Egglestons' property is not a measure of their damages. It would be if this had been a condemnation action in which the County was buying their entire eight acres with all improvements. But in that case, the County would end up owning the Egglestons' real estate. It would pay $2.7 million, but it would have acquired a $2.7 million piece of property. Here, following the lawsuit, the Egglestons still owned their eight acres (less the .38 acre for which they were paid) and improvements. If it *is* a $2.7 million property, it is *their* $2.7 million property. Its value is not a measure of their damage claims.

Second, as county engineer Joel Ristau testified and exhibits confirm, only $62,800 was paid for property: for both the .38 acre in fee and the temporary easement. The remainder was characterized as "costs to cure." RP at 648-49; Ex. 1; Ex. 204 at 2. Stated differently, these were foreseeable damages the Egglestons would incur during the bridge and related road construction. And no one testified that $62,800 was the fair market value of the .38 acre in fee. To say that it was ascribes no value to the easement. More importantly, the county might have paid more than fair market value, recognizing

the cost and delay it would incur if required to condemn property essential to the bridge project. *See State v. Costich*, 152 Wn.2d 463, 471, 98 P.3d 795 (2004) (nothing in Washington's eminent domain statute prohibits the State from offering an amount in excess of its lowest appraisal, in the interest of a pretrial settlement, which avoids litigation and its resulting cost and delay).

Finally, the inference as to value suggested by the Egglestons is wildly inconsistent with the only competent testimony on value the jury heard:  Mr. Knight's testimony that the property was worth $750,000 to $1 million *with* the business driveway, and $350,000 without it.

For all of these reasons, the amount paid by Asotin County in 2009 does not support the jury's $1.65 million verdict.

*Knight cross-examination*

The Egglestons also rely on Mr. Knight's testimony to the value of a neighboring property that came up during cross-examination by the County's lawyer.  It arose after Mr. Knight expressed his opinion to a $750,000 to $1 million value for the Eggleston property *with* the business driveway, and $350,000 without it, suggesting a loss of value between $400,000 and $650,000.  The County's lawyer questioned whether the Egglestons' property was really worth as little as $350,000 without the business driveway:

Q.     Well, if you're diminishing the value from 350 how much does good land along that river go for an acre?

A.     That property is very valuable.  Right next to it sold for 100,000 an acre.

Q.     Okay.  Is, does the one next to it have a beach?

A.     No.

Q.     Okay.  But you said that beach adds a lot of value to the property?

A.     It does.

Q.     100,000 an acre, eight acres, 800,000, plus you have to add, because the beach would add, even without a rockery retaining wall, without a business drive, it is still worth $800,000 or more, isn't that right, according to your math?

A.     No.

Q.     What am I missing?

A.     It's the access that we're missing.

Q.     Okay.  But if I was to go buy that property because I wanted to put a business in, wouldn't I be able to sell that for 800,000 to a million dollars if I owned that because it has that exclusive beach and that exclusive eight acres of beautiful pasture land?  According to your numbers it's almost worthless at this point.

A.     It's not worthless.  It's worth about $350,000.

RP at 477.

The Egglestons' lawyer perceived this exchange as possibly helpful.  He now suggests that the following point he made during his rebuttal closing argument might support the $1.65 million award of damages:

> You heard [the County's lawyer] and I disagree from time to time during this case, but I've got to tell you, I'll start off with I'm in agreement on something with him, absolutely in agreement with him.

13

> I promise he believes this land at $100 an acre is worth $800,000 minimum today. If we change the $800,000, we saw the calculations that Mr. Knight did; two to three times the value once you add the business. So the damages can go up to 2.4 million dollars.

RP at 730.

We assume that when the County's lawyer cross-examined Mr. Knight, his point was that if the Egglestons' property would be worth $750,000 to $1 million if the desired business driveway had been built, and was still worth $800,000 based on the sale of a neighboring property, then the diminution in value caused by not building the road was much less than $400,000 to $650,000.

That inference is subject to its own attack, but the Egglestons' lawyer's closing argument is unsupported by the evidence or common sense, in addition to being irrelevant.

It is irrelevant because, as earlier explained, the Egglestons' damages are not measured by the value of property they still own.

It is unsupported by evidence because Mr. Knight never testified that his damages measure was based on reasoning that the Aardvarks business would increase the value of the property on which it operated two- to three-fold, whatever the property was worth without the business.

It is unsupported by common sense, because it defies common sense that a business that requires riverfront, equipment, and labor and produces $35,000 per year

14

would produce dramatically different financial benefits depending on the value of the upland property. Common sense dictates that the same business would not be worth (or, to quote the Egglestons' rebuttal argument, damages would not "go up to") $300,000 if the upland property is worth $100,000, $1.5 million if the upland property is worth $500,000, and $6 million if the upland property is worth $2 million. RP at 730.

The trial court's order of a new trial on damages is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Lawrence-Berrey, J.